*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 07-91-P-H* |
| | ) | |
| *WILLIAM F. BATER,* | ) | |
| | ) | |
| *Defendant* | ) | |

### *RECOMMENDED DECISION ON MOTIONS TO DISMISS AND TO SUPPRESS*

William F. Bater, charged with possession of a firearm by a felon, in violation of 18 U.S.C.

§§ 922(g)(1) and 924(e), Indictment (Docket No. 1), moves to dismiss the charge due to prejudicial

pre-indictment delay, Defendants' [sic] Motion to Dismiss for Prejudicial Pre-Indictment Delay

("Motion to Dismiss") (Docket No. 17), and to suppress the firearm that is the basis of the charge and

any statements made by the defendant to law enforcement officers on January 9, 2003, Defendants'

[sic] Motion to Suppress, etc. ("Motion to Suppress") (Docket No. 16).  An evidentiary hearing was

held before me on January 14, 2008 at which the defendant appeared with counsel.  Three exhibits

were offered by the government and two by the defendant, all of which were admitted without

objection.  Five witnesses, including the defendant, testified.  I now recommend that the following

findings of fact be adopted and that the motions be denied.

### I.  Proposed Findings of Fact

John Hainey, a Maine State Trooper since 1998 and a detective since 2004, was investigating

Nicholas Phillips in 2003 in connection with several burglary cases and one arson in Maine and New

Hampshire.  Transcript of Proceedings ("Tr.") (Docket No. 45) at 8, 10.  The crimes were relatively

serious for his area of responsibility.  *Id*. at 10.  The Conway, New Hampshire police met the

defendant while looking for Phillips at the residence of Sarah Otis in North Conway, New Hampshire. *Id*. at 11.  Hainey had been advised by the Conway police that the defendant, who was Phillips' uncle, was himself a convicted felon.  *Id*.  On January 9, 2003 Hainey twice went to the defendant's apartment over the North Bridgton, Maine, post office. *Id*. at 11, 98.  During the first visit, he and his partner, Trooper Andre Paradis,[1] told the defendant that they were looking for Phillips, for whom they had an arrest warrant.  *Id*. at 14, 15, 138.  The defendant told the troopers that Phillips was not at his apartment and offered to let the troopers search the apartment for Phillips. *Id*. at 11, 138.  He told the troopers that he did not know where Phillips was, a statement that was untrue.  *Id*. at 138.  He also falsely told the troopers that he had not seen Phillips that day. *Id*. at 138-39.  The troopers declined to search the apartment and left.  *Id*. at 11, 139.

Approximately two hours later, the troopers returned to the defendant's apartment.  *Id.* at 12. At that time, the defendant's common-law wife and her daughter were sitting at a table in the apartment kitchen, doing the daughter's homework.  *Id.* at 97-98.  At the time of the troopers' previous visit, the daughter had still been at school and Christina Murray Bater, the defendant's wife, who then worked nights, had been asleep.  *Id*. at 109-10, 167.  The defendant again told the troopers that Phillips was not in the apartment.  *Id*. at 12.  The troopers told the defendant that a witness had seen Phillips that day at the defendant's residence, working on a car with the defendant.  *Id*. at 12, 168-69.  They asked the defendant why he had lied to them. *Id*. at 12. They told the defendant that, if he was lying to them or if Phillips was in fact in the defendant's apartment, the defendant could be charged with the crimes of lying to a police officer, harboring a fugitive or aiding and abetting Phillips.  *Id*. at 12, 170.  The defendant, who had initially refused to allow the troopers to search his apartment on this occasion, then agreed to let the troopers look for Phillips in the apartment. *Id*. at 12, 169-70.

---

[1] Hainey is a detective with the Maine State Police and Paradis is a trooper.  For ease of reference, I will refer to them together as (*continued on next page*)

The defendant put his dog into the bedroom that he shared with his wife and closed the door. *Id*. at 13, 144.  He then accompanied the troopers at Hainey's request as they searched the rooms in the small apartment.  *Id*. at 14.  Hainey asked the defendant to accompany them during the search because he was being cooperative and because he did not want any misunderstandings to arise as a result of the search.  *Id*.  The last room searched was the defendant's bedroom, after he had moved his dog to his stepdaughter's bedroom.  *Id*. at 16, 146.  Hainey looked under the bed because there was room under the bed for a person to hide.  *Id*. at 17.  He saw what he believed to be two small firearms under the bed and said to the defendant, "You know you can't have any firearms," because the defendant was a convicted felon.  *Id*. at 18.  The defendant replied, "Those are BB guns."  *Id*. Hainey then asked the defendant, "Do you have any firearms in the house?"  *Id*. The defendant said, "Yes."  *Id*. at 19.  Hainey asked, "Can you show it to me?"  *Id*.  The defendant pulled up the mattress and showed Hainey a gun case.  *Id*. at 20.  Hainey, still on his knees, pulled the case, which is Government Exh. 4, out from under the bed.  *Id*.  He opened the case and found a Remington .308 hunting rifle inside.  *Id*. at 20-21. The defendant did not object to Hainey's opening of the case. *Id*. at 21.  Hainey could not see the gun case when he entered the bedroom.  *Id*. at 37.

The defendant was not arrested that day because the troopers had the firearm and had more investigating to do and because they wanted his continued cooperation in the search for Phillips. *Id*. at 45.  The troopers asked the defendant to help them locate Phillips.  *Id*. at 22.  The defendant agreed to do this by accompanying them to the Bridgton police department and placing telephone calls to people he knew to be friends or associates of Phillips.  *Id*. at 22, 154-55, 157.  As they left the apartment, Hainey told the defendant's wife that the defendant was not under arrest.  *Id*. at 153. The defendant sat in the front seat of Hainey's unmarked cruiser as Hainey drove him to the police station; the trip took

---

"troopers," although that term may not be strictly accurate.

less than five minutes and the defendant was not handcuffed. *Id*. at 22-23. Hainey does not remember why they decided to go to the police station to make the calls; he does remember that his cell phone was not working. *Id*. at 23.

The defendant and the troopers went into a conference room at the police station which had two doors and two windows. *Id*. at 43. The doors were closed to keep out noise from other activities taking place in the station and for privacy. *Id*. The defendant made two or three unsuccessful telephone calls in an attempt to locate Phillips. *Id*. at 23. The troopers did not question or interrogate the defendant. *Id*. at 23-24. They told the defendant throughout the second contact that he was free to leave. *Id*. at 24. After the defendant had tried to locate Phillips through the telephone calls, Hainey drove him home. *Id*. After they returned to the defendant's apartment, the defendant told Hainey that the rifle was a Christmas present for his father and would have been out of the apartment in a couple of days. *Id*. at 45. Sometime later that evening, Phillips called the defendant and asked him to call the Maine State Police and tell them where he was, which the defendant did. *Id*. at 24-25, 179.

While Hainey agreed that on this occasion Phillips had made himself difficult to find, he did not consider Phillips to be likely to flee because the Conway police department had found him in a relatively short time. *Id*. at 26-28. Someone from the Conway police department spoke with the defendant in December 2002 about Phillips and a short time later that same day Phillips went to the Conway police department to speak with the detective who had been looking for him. *Id*. at 29.

Special Agent Malcolm Van Alstyne of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") interviewed the defendant on January 21, 2003. *Id*. at 52, 56-57. At that time the defendant said that the rifle belonged to his wife or fiancée; he never said that he owned or used the rifle. *Id*. at 57. Van Alstyne subsequently interviewed Witness 1 ("W-1"), the person in whose name the rifle had been purchased, who provided statements about the purchase that were inconsistent with

4

the defendant's statements on that subject. *Id* . at 57-59.  Van Alstyne took possession of the rifle, case and ammunition around that time. *Id*. at 58.  On April 1, 2003 Van Alstyne interviewed Phillips about the purchase of the rifle; Phillips' recollections were inconsistent with what the defendant had related. *Id*. at 58-59.  During January 2003 Van Alstyne received certified records from Florida and Utah confirming that the defendant was a convicted felon. *Id*. at 66-67.  During early 2003 Van Alstyne was attempting to prove that the defendant qualified as an armed career criminal as well as a felon in possession of a firearm. *Id*. at 73, 85.  Around June 6, 2003 Van Alstyne recommended that the United States Attorney charge the defendant with being a felon in possession of a firearm. *Id*. at 74.

At the time he made the recommendation, Van Alstyne did not know where Phillips was and had no reason to think that Phillips would not be available to testify at any trial of the defendant. *Id.* at 61, 74.  He did not check on Phillips' location at that time. *Id*. at 74.  He was asked to serve a grand jury subpoena on Phillips in 2006 and made several unsuccessful attempts to find him. *Id*. at 61-62. He did not contact the defendant or his wife at that time to find out where Phillips was because Phillips had told him in the 2003 interview that the defendant had warned him that the ATF might be coming to talk with him about the rifle and Van Alstyne did not want the defendant to forewarn Phillips about the subpoena. *Id*.

On December 13, 2007 L. Ray Peters, a private investigator retained on behalf of the defendant, spoke with Phillips by telephone at a number with a Massachusetts area code, which was given to him by the defendant's wife. *Id*. at 90; Affidavit . . . by L. Ray Peters ("Peters Aff.") (Def. Exh. 1) ¶ 16. Phillips refused to say where he was at the time and stated that he would not return to Maine until all charges pending against him in Maine were dismissed, and outstanding warrants for his arrest were recalled and his criminal record was expunged.  Tr. at 94; Peters Aff. ¶¶ 16-17.

The defendant's wife testified that the rifle and the case in which it was found had been given to her by W-1 after she and the defendant had allowed W-1 to live with them from September to December 2002, during which time W-1 helped care for the defendant, who had broken his leg.  Tr. at 113, 115-17, 151-52.  She testified that she usually kept the rifle at her father-in-law's home but that on this occasion she had forgotten to return the rifle there after practicing with it and put it under the bed without the defendant's knowledge.  *Id.* at 119.

Despite testifying that he has "an exceptional memory," *id.* at 136, the defendant was unable to recall how much W-1 had paid for the rifle that he had advised her to buy and that he testified she bought in his presence, *id.* at 162-65, the incident which led to his conviction in the Brockton (Massachusetts) District Court, *id.* at 160, or whether he rode in the front or back seat of Hainey's unmarked cruiser on January 9, 2003, *id.* at 175. He testified that he was not "pressured" by the troopers on January 9 the way he was when he was interviewed again on January 21, 2003, after he had been given *Miranda*[2] warnings.  *Id.* at 184.

## II.  Motion to Dismiss

The indictment in this case was handed down on September 18, 2007, some four years and nine months after the alleged crime.  Indictment.  The defendant contends that this passage of time entitles him to dismissal of the charge.  A defendant who seeks dismissal of criminal charges on the basis of pre-indictment delay must show that the delay caused substantial prejudice to his right to a fair trial and that the delay was an intentional device used by the prosecution to gain a tactical advantage over the defendant or to harass him.  *United States v. Marion*, 404 U.S. 307, 324-25 (1971).  The burden to demonstrate prejudice and intent is on the defendant.  *United States v. Kenrick*, 221 F.3d 19, 33 (1st Cir. 2000).

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Here, the defendant contends that the actual and substantial prejudice he has suffered as a result of the delay is the unavailability of Nicholas Phillips as a witness. Defendants' [sic] Reply to Government's Consolidated Memorandum in Response to Defendant's Pretrial Motions ("Reply") (Docket No. 32) at 2. He states, without any further description, that Phillips' testimony would be "exculpatory in some respects and corroborate expected testimony in other respects." *Id*. He cites in support of this characterization only paragraph 8 of the affidavit of Van Alstyne. *Id*. That paragraph, in its entirety, states:

> On April 1, 2003, Phillips was interviewed at the Oxford County Jail by Special Agent Saenz and I regarding his knowledge [of] the purchase [of] the Firearm. Phillips stated, among other things, that he had been visited by the defendant and was told that ATF agents may come to speak with him. When questioned, he gave the same account about the firearm and how it ended up at the defendant's residence as did the defendant during his interview, except that Phillips stated: (1) only he and Witness-1 were present when the Firearm was purchased, (2) he recommended that Witness-1 give the firearm to the defendant's fiancé[e] and (3) Witness-1 did not know the defendant or the defendant's fiancé[e]. Phillips['] statement was inconsistent with previous statements made by the defendant that the defendant was present when the Firearm was purchased and that the defendant, his fiancé[e], and Witness-1 were good friends. When Phillips finished giving his account, he was told that the agents did not believe him. He immediately became angry and stated that he no longer wished to answer questions and that he was finished with the interview. Special Agent Saenz informed Phillips that the defendant had admitted to being present during the purchase. Special Agent Saenz then told Phillips that he might [] be subpoenaed to Grand Jury and that he would be subjecting himself to possible federal charges if he lied to protect his uncle. Phillips then demanded to be returned to his cell.

[Affidavit of Malcolm D. Van Alstyne, Jr.] ("Van Alstyne Aff."), Gov't Exh. 2, ¶ 8.

None of the three specific statements by Phillips reported in this paragraph of the affidavit may reasonably be considered to be exculpatory; none of them concerns an element of the crime with which the defendant is charged, and the fact that they contradict the defendant's version of events can hardly be helpful to the defendant. Assuming *arguendo* that Phillips' testimony would otherwise confirm that of the defendant with respect to the crime charged, and that such testimony would be exculpatory, the

defendant still has not shown that Phillips is unavailable. Indeed, the defendant's wife appears to know exactly where Phillips is.[3] The defendant produced no evidence that would allow me reasonably to conclude that he could not compel Phillips to testify for him, using the traditional methods for obtaining testimony from residents of other states.

Even if Phillips were also assumed to be unavailable to testify at the defendant's trial, the defendant has failed even to begin to show that the government orchestrated Phillips' unavailability in order to gain an advantage at trial. Testimony from another convicted felon in corroboration of the defendant's version of events would not require a different outcome or even, from all that appears, allow a different outcome.

In addition, the defendant made no showing at the evidentiary hearing that any agent of the government knew or had reason to know that Phillips would make himself unavailable to help his uncle if and when his uncle was charged. Indeed, the tenor of his interview with Van Alstyne suggests the opposite. There was no evidence suggesting that any agent of the government knew or could have known that Phillips would have charges pending against him at some time in the future after his release from the Oxford County Jail at the conclusion of his sentence or warrants issued for his arrest at some future time such that he would refuse to enter Maine voluntarily.[4]

---

[3] Indeed, Peters, the private investigator retained on behalf of the defendant, is careful not to include in his affidavit more than the area code of the cell phone number for Phillips given to him by the defendant's wife, Peters Aff. ¶ 10, presumably so that the government will not be able to track Phillips down itself. Counsel for the defendant, who called his wife as a witness at the evidentiary hearing, carefully did not ask her whether she knew where Phillips is now.

[4] The defendant "requests the opportunity to self-amend the instant motion to permit him to make a further showing of prejudice after he has had an opportunity to investigate the additional discovery which may be disclosed at a later date and to conduct his own investigation." Motion to Dismiss at 2. To the extent that the defendant means to press this request now that an evidentiary hearing has been held on his motion, *see* Reply at 4-5, it is denied. Motions are not "held open" for ruling until the moving party deems that he has no further "amendment" or modification to his motion to offer. If some other basis for dismissal of this charge becomes apparent to the defendant later in this proceeding, and that basis could not have been known to or discovered by him earlier, he may file the appropriate motion, as is always the case in any criminal proceeding.

### III.  Motion to Suppress

With respect to the rifle, the defendant contends that his consent to the search of his apartment was not voluntary and that the search exceeded the scope of any consent that he might have given. Motion to Suppress at 5-9.  He also argues that he revoked the consent to search the apartment that he gave during the troopers' first visit, *id*. at 4-5, but the government does not contend that the search was conducted pursuant to that consent, so this argument is irrelevant to the outcome of the motion to suppress.  I will not address it further.

In *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), the Supreme Court held that "the Fourth and Fourteenth Amendments require that a consent [to search] not be coerced, by explicit or implicit means, by implied threat or covert force[,]" *id*. at 228.  "The determination of voluntariness turns on an assessment of the totality of the circumstances."  *United States v. Forbes*, 181 F.3d 1, 5 (1st Cir. 1999) (citation and internal punctuation omitted).  "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth*, 412 U.S. at 229.  Among the factors to be considered in this examination are the consenting party's age, education, experience, intelligence and knowledge of the right to withhold consent, whether the party was advised of his constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.  *Forbes*, 181 F.3d at 5.

Here, the defendant admitted that he has an extensive criminal history and has been arrested more than 30 times. Tr. at 158-59.  During his testimony, he was able to define the status of "armed career criminal" under federal law in a manner more concise and accurate than many a lawyer would be able to do under similar circumstances.  *Id*. at 190.  Neither his age, education, experience or intelligence suggests any reason to regard the circumstances of his consent during the troopers' second

visit as coercive.  His experience, in fact, leads inevitably to the conclusion that he was well aware of his right to withhold consent to search the apartment.  He was apparently not advised of his constitutional rights by the troopers before he consented, but, again, his experience makes this unnecessary.  Nor was anything about the situation inherently coercive.  The defendant testified that he consented because the troopers told him that if he did not cooperate he could be arrested for aiding and abetting a fugitive and lying to officials, with the result that he felt cornered and not free to leave.  He claims he also consented because he was in the midst of a child custody case in Massachusetts and could not afford to be arrested.  There is no evidence that the troopers knew of the existence of the custody case.

It is significant that the defendant testified that the troopers said that he *could* be arrested if he did not cooperate with their request to search his apartment, not that he *would* be arrested.  Hainey testified that on the second trip to the defendant's apartment, the troopers told the defendant that a witness had seen Phillips at the defendant's residence that day and asked the defendant why he had lied when he said on the first visit that he had not seen Phillips in over a month.  Hainey further testified that the troopers also told the defendant that if he was lying to them and if he was harboring Phillips he could be charged.  After this exchange, according to Hainey, Phillips consented to the search.  These statements by the troopers do not rise to the level of coercive means to obtain consent nor did they create an inherently coercive atmosphere.  If there is any conflict between the testimony of the defendant and that of Hainey on this issue, I credit Hainey's testimony.  The evidence does not support the other factual allegations made in the defendant's motion, Motion to Suppress at 6-7, to support his contention that he was coerced into giving consent.

The defendant next argues that Hainey's search exceeded the scope of the consent he gave to search his apartment.  *Id*. at 7-9.  He asserts that his "consent to search was explicitly limited to a

search 'for his nephew[,]'" *id*. at 8, and, since his nephew could not have fit inside the gun case, Hainey should not have opened the case or, presumably, seized it.  The evidence does not support the conclusion that the defendant's consent was so "explicitly limited."  Hainey did testify, however, that when they began searching the apartment the troopers were looking only for Phillips and were looking in places where Phillips "could fit."  Tr. at 30.  The space under the defendant's bed was one of those places.  It is at this point in the chain of events that the testimony of Hainey and that of the defendant diverge sharply.  As noted above, I find more credible Hainey's testimony that, having found the BB guns and knowing that the defendant was a convicted felon, he asked the defendant whether there were any firearms in the house and the defendant responded "Yes."  Hainey then asked the defendant to show him the firearm or firearms and the defendant lifted the mattress and exposed the gun case.  At this point, Hainey did not want the defendant to open the case and, following search safety protocol, he opened the case himself to determine whether it contained a firearm and, if so, to remove the weapon from the area safely.  *Id*. at 35-36.  There is nothing constitutionally offensive in these actions under these circumstances.  *See, e.g., United States v. Banks*, __ F.3d __, 2008 WL 80577 (8th Cir. Jan. 9, 2008), at *1, *2- *5;  *United States v. Goins*, 2005 WL 878100 (W.D. Wis. Apr. 15, 2005), at *3, *8; *United States v. Wall*, 807 F.Supp. 1271, 1276-77 (E.D. Mich. 1992); *but see United States v. Gust*, 405 F.3d 797, 804-05 (9th Cir. 2005) (gun case not readily identifiable as such by general public may not be opened by officers who recognize it is gun case without search warrant).

　　　　Even if, as the defendant testified, Hainey asked him what was in the case and he responded, "Not my nephew," and, when Hainey started to open the case, he told him "You can't do that, my nephew's not in there," Tr. at 148, the result would be the same.  In this scenario, the defendant lacks standing to object to the search of the case, which he testified was not his and which he testified he did

not know was under the bed.  *United States v. Garcia-Rosa*, 876 F.2d 209, 219 (1st Cir. 1989).  *See also United States v. Parke*, 842 F. Supp. 281, 289 (E.D.Mich. 1994).

With respect to any statements made by the defendant before he was given *Miranda* warnings on January 21, 2003,[5] the defendant contends that a reasonable person in his position would have believed that he was in custody when he rode to the Bridgton police station with Hainey on January 9, 2003 and that answers he gave at the police station to the troopers' questions about the firearm accordingly must be suppressed, as no *Miranda* warnings were given at that time.

Hainey, the only testifying officer who was with the defendant on January 9, 2003 at the Bridgton police department, when asked, "Did you interrogate [the defendant] or question him at the police station?" responded "No."  Tr. at 23-24.  He also testified that he had no notes of any such questioning, which he would have made at the time if he had questioned the defendant.  *Id*. at 24. This testimony, which I find credible, requires that the motion to suppress any answers by the defendant to such questions be denied.  The defendant did testify that the troopers asked him questions about the rifle that night; that he responded "That isn't why you brought me down here, you brought me here to help find my nephew;" that the troopers continued to ask whether he knew who owned the rifle; and that he did not see any harm in telling them that.  *Id*. at 157-58.  However, in light of Hainey's testimony, there is no need for any of the testimony by the defendant to be evaluated, as the government cannot use any responses that the defendant might have given to such questions against him when the person who supposedly asked the questions denies having done so.  There is no *Miranda* issue here.

---

[5] The defendant's motion to suppress and his supplemental memorandum do not mention the January 21 statements, so I conclude that they are not included in the statements that the defendant seeks to suppress.  The defendant's supplemental memorandum gives the date of the *Miranda* warning as January 23, 2003, Defendants' [sic] Post Hearing Brief, etc. (Docket No. 55) at 10, but January 21, 2003 appears to be the correct date, Tr. at 56-57.

## IV.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and the defendant's motions to dismiss and to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 7th day of February, 2008.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge